IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THOMAS PAUL DEGRADO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13-cv-05978 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| IMHOTEP CARTER, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

As a prisoner at Stateville Correctional Center ("Stateville"), Plaintiff Thomas Degrado fell and broke his wrist. He claims that he suffered unnecessary pain and trauma—and ultimately, permanent damage—because his medical treatment was needlessly delayed. As a result, he has sued the prison officials and health care providers he believes to have been responsible pursuant to 42 U.S.C. § 1983. Two defendants remain in this case: Marcus Hardy, Stateville's former Warden, and Royce Brown-Reed, Stateville's former Health Care Administrator (together, "Defendants").[1] Now before the Court are Defendants' motion for summary judgment. (Dkt. No. 212.) Because a reasonable jury could find that Hardy was deliberately indifferent to Degrado's serious medical condition, the motion is denied as to Hardy. But Degrado has not offered evidence from which a reasonable jury could find that Brown-Reed acted with deliberate indifference, and so she is entitled to judgment in her favor as a matter of law.

---

[1] Degrado's Second Amended Complaint named three additional defendants: Imhotep Carter (Stateville's medical director), LaTanya Williams (a physician assistant at Stateville), and Wexford Health Sources, Inc. (the corporation that employed Carter and Williams). However, Degrado's claims against those parties were dismissed pursuant to settlement. (*See* Dkt. No. 197.)

## BACKGROUND

For purposes of summary judgment, the Court views the evidence in the light most favorable to Degrado as the nonmoving party and draws all reasonable inferences in his favor. *Weber v. Univs. Rsch. Ass'n., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). Except where otherwise noted, the following facts are undisputed.

At all relevant times, Degrado was a prisoner within the Illinois Department of Corrections, housed at Stateville. (Pl.'s Resp. to Def.'s Statement of Material Facts ("PRDSOF") ¶ 1, Dkt. No. 218.) Brown-Reed and Hardy were IDOC employees; Brown-Reed was Stateville's Health Care Administrator and Hardy was its Chief Administrative Officer (also referred to as "Warden"). (*Id.* ¶ 2.) On August 1, 2011, Degrado injured his left wrist after he fell while running during recreation period. (*Id.* ¶ 6.) On August 2, he was seen by a physician assistant in Stateville's Health Care Unit ("HCU"); he was scheduled to receive x-rays on August 3 but did not receive them, for reasons disputed by the parties. (*Id.* ¶¶ 7–8.) However, he was x-rayed on August 4 and a radiologist diagnosed him with an "impacted fracture" (*i.e.*, broken wrist). (*Id.* ¶ 10.) On August 8, he was seen by Dr. Imhotep Carter, who diagnosed him with a dislocated (*i.e.*, not broken) wrist. (*Id.* ¶¶ 10–11.)

On August 12, 2011, Degrado fell again, landing on his injured wrist. He asked to be transferred to the HCU based on his new injury but was refused. (*Id.* ¶¶ 12–13.) Between November 2011 and February 2012, Degrado was seen multiple times at Hinsdale Orthopedics (an outside provider) by Dr. Urbanosky. (*Id.* ¶ 14.) Degrado's treatment was marked by numerous delays. The record indicates that it took at least six weeks from when Hinsdale Orthopedics

2

ordered a CT scan for Degrado to receive the scan on December 13, 2011.² (Def.'s Resp. to Pl.'s Statement of Add'l Facts ("DRPSOF") ¶ 25, Dkt. No. 223.) On February 17, 2012, Degrado's surgery was delayed because Hinsdale Orthopedics had not received his CT scans, which had been taken more than two months earlier.³ (*Id.* ¶ 26.) It took at least four months for the CT scans to be delivered. (*Id.* ¶ 27.) Degrado eventually had surgery on May 29, 2012. (PRDSOF ¶ 16.) Thus, it took 43 weeks from his initial injury for Degrado to receive surgery. (DRPSOF ¶ 32.) Ultimately, according to the unrebutted expert opinion of Dr. Bruce Goldberg, the medical care provided to Degrado caused exacerbated injury, prolonged pain, and permanent impairment. (*Id.* ¶ 36.)

Hardy and Brown-Reed were both involved in Stateville's grievance process, through which prisoners may seek relief from prison administrators for harms they have suffered. For example, a grievance may be submitted regarding issues with a prisoner's personal property, disability accommodations, medical treatment, and a range of other issues. (*See* Def.'s Mem. of Law, Ex. 5, Aug. 9 Grievance, Dkt. No. 214-5.) The parties dispute the extent of Hardy's and Brown-Reed's involvement in the grievance process. Hardy was the "ultimate decision maker" for emergency grievances, but there is no evidence indicating that Hardy himself reviewed or decided those grievances; instead, the record indicates that Hardy's designees generally reviewed grievances on his behalf. (DRPSOF ¶ 1; *see* Def.'s Mem. of Law, Ex. 7, Hardy Answer to Interrogs. ("Hardy Interrogs.") ¶ 5, Dkt. No. 214-7.) Both Defendants assert that grievances and

---

² Defendants dispute the timing, stating that Degrado's doctor only planned to order the CT scan and that the date when the CT scan was actually ordered is unknown.

³ Defendants object that this fact is conclusory and not reflected in contemporary notes from Degrado's treating physician. But the uncontroverted materials provided by Degrado, including an opinion by an expert in correctional healthcare, indicate that Degrado's surgery was delayed because officials at Stateville neglected to take action to ensure that Degrado's physicians received his CT scan. (Pl.'s Mem. of Law, Ex. 4, Hellerstein Op. at 7–10, Dkt. No. 220-4.)

letters addressed to them were filtered through their designees, but Degrado counters that Hardy was personally involved in emergency grievances that were escalated to his attention and that Brown-Reed personally reviewed grievances that Hardy sent to her. (PRDSOF ¶ 26.) Beyond the grievance process, prisoners sometimes sent letters directly to Hardy, but he generally did not review them. (Hardy Interrogs. ¶ 8.) Instead, his designees reviewed them and routed them to departments within Stateville, although Hardy reviewed and responded to letters that "reflected an emergency situation." (*Id.*) Hardy does not recall receiving any letters from Degrado or talking to anyone about his letters and complaints. (PRDSOF ¶ 18.)

Brown-Reed supervised everyone in the HCU, reviewed at least some grievances that Hardy determined to be emergency grievances, and supervised HCU staff who reviewed grievances.[4] (DRPSOF ¶¶ 3–5.) The record indicates that Brown-Reed was never consulted by Hardy in determining whether or not a grievance should be treated as an emergency, although the parties dispute that fact.[5]

In early August, just after he first injured his wrist, Degrado submitted two grievances regarding his medical care. On August 9, 2011, he submitted a grievance flagged as an

---

[4] Degrado asserts that Brown-Reed reviewed all grievances that Hardy determined to be emergency grievances, but that is not supported by the materials he cites. (*See* Def.'s Mem. of Law, Ex. 2, Brown-Reed Dep. 20:8–25:18, 39:20–40:02, Dkt. No. 214-2; Pl.'s Mem. of Law, Ex. 5, Carter Dep. 40:5–12, 238:14–23, Dkt. No. 220-5.) Instead, the record indicates that Brown-Reed reviewed some grievances within her office. Even if she had reviewed all grievances determined to be emergencies, that fact would not be material because the record does not indicate that any of Degrado's grievances were determined to be emergencies. Brown-Reed was also on medical leave from March to November 2011, and therefore would not have seen any grievances that Degrado submitted during that time.

[5] Brown-Reed's deposition testimony indicates that the warden and the grievance officer, not the HCU, screened grievances to determine whether they were emergencies, and Brown-Reed also testified that she could not remember whether the warden and the grievance officer ever contacted the HCU to determine whether a grievance constituted an emergency. (Brown-Reed Dep. 40:16–42:17.) The Court concludes that Degrado has at least established a contested issue of fact regarding whether Brown-Reed was ever contacted by Hardy regarding emergency grievances.

"emergency" due to "a substantial risk of imminent personal injury or other serious or irreparable harm to self."[6] (Aug. 9 Grievance.) In his grievance, Degrado reported that Stateville staff had caused unnecessary delays in obtaining x-rays of his wrist and consulting a doctor by denying him transportation to medical appointments and failing to coordinate his care. (*Id.* at 2–4.) He requested the following relief: "I want to be seen by a specialist and to get an MRI and/or tests on my injury <u>before</u> the damage becomes permanent or requiring surgery." (*Id.* at 1.) His grievance was denied as a non-emergency on August 31, 2011 by Hardy's designee, Kevin Senor. (PRDOSF ¶ 19.)

Degrado submitted a subsequent emergency grievance on August 14, 2011. (Def.'s Mem. of Law, Ex. 6, Aug. 14 Grievance, Dkt. No. 214-6.) In that grievance, he noted that his x-ray technician had opined that his wrist was broken, but his doctor at the HCU had said that it was only "dislocated;" he stated that he had tripped and fallen on his hand while being transported; and he again requested care from a specialist "before irreparable damage is done." (*Id.*) This grievance was denied as a non-emergency by Senor on August 24, 2011. (PRDSOF ¶ 21.)

Hardy and Brown-Reed do not recall seeing or addressing any of Degrado's grievances. (*Id.* ¶¶ 23, 25.) In fact, Brown-Reed was on medical leave from March to November 2011. (*Id.* ¶ 24.) Degrado claims that he spoke with Hardy about his injury in November 2011; Hardy does not recall the conversation but does not deny that it occurred. (DRPSOF ¶¶ 14–15.) On November 3, 2011, Degrado's mother sent a letter to Hardy regarding Degrado's injuries and medical treatment. (Id. ¶ 17.) Such letters were usually reviewed by Hardy's designee and Hardy does not recall reviewing this one. (*Id.* ¶ 18.) Degrado's mother sent a second letter on November 14, 2011,

---

[6] Defendants note that the dates on the grievances and letters at issue do not necessarily establish the date that the grievances and letters were actually sent, but that is not material for purposes of this motion.

also regarding Degrado's injuries and medical treatment. (*Id.* ¶ 21.) Hardy signed off on a response to that letter. (*Id.* ¶ 23.)

Degrado also sent a letter to Hardy on November 14, 2011, asking for help addressing his medical treatment. (*Id.* ¶ 19.) Hardy does not recall reviewing the letter and again claims that such letters were generally handled by his designee. (*Id.* ¶ 20.) On February 21, 2012 and March 28, 2012, Degrado again tried to get help by writing Hardy about delays in his medical treatment; Hardy does not remember them. (*Id.* ¶¶ 28–31.)

## DISCUSSION

Summary judgment is warranted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views all evidence in the light most favorable to Degrado as the non-moving party and draws all reasonable inferences in his favor. *Weber*, 621 F.3d at 592. The Court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009). A genuine issue of material fact exists only if there is "sufficient evidence favoring the nonmoving party . . . to permit a jury to return a verdict for that party." *Johnson v. Manitowoc County*, 635 F.3d 331, 334 (7th Cir. 2011). To oppose summary judgment successfully, "the non-moving party 'may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence.'" *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020) (quoting *Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563 (7th Cir. 2001)).

6

Degrado alleges that Defendants violated his rights under the Eighth Amendment not to be subjected to cruel and unusual punishment. A "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives another "person within the jurisdiction [of the United States] . . . of any [constitutional] rights . . . shall be liable to the party injured." 42 U.S.C. § 1983. Liability can be established only where "the individual defendant . . . caused or participated in a constitutional deprivation." *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005). Prisoners enjoy a constitutional right not to be subjected to cruel and unusual punishment. U.S. Const. amend. VIII. That right includes "a right to adequate medical care." *Berry v. Peterman*, 604 F.3d 435, 439 (7th Cir. 2010). To state a claim for constitutionally deficient medical care, a plaintiff "must demonstrate two elements: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).

Defendants do not challenge whether a jury could find that Degrado's medical condition was objectively serious. Instead, they contend that the record could not support a jury verdict that they were deliberately indifferent to his broken wrist. To establish deliberate indifference, Degrado must demonstrate that the particular Defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," meaning that he or she not only was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that he or she also "dr[ew] the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, deliberate indifference requires "a culpable state of mind, something akin to criminal recklessness." *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006). Degrado presents two theories of liability here. First, he contends that Defendants knew he was receiving improper medical care and did nothing

7

to help him. Second, he asserts that Defendants' administration of Stateville's grievance system establishes their deliberate indifference.

### I. Defendants' Knowledge of and Response to Degrado's Medical Care

Defendants first contend that they were not involved in and did not know about Degrado's medical care. They further assert that even if they were aware of Degrado's complaints, he has not shown that they failed to respond appropriately. Deliberate indifference can only be established when a defendant was subjectively aware of a serious medical need. *See Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). Thus, unless Degrado can identify evidence allowing a "reasonable jury" to find that Defendants were actually aware of his complaints, Defendants are entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

#### A. Hardy

The Court begins with Hardy. As a prison employee without medical expertise, Hardy "can rely on the expertise of medical personnel. . . . [I]f a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett*, 658 F.3d at 755; *see also Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (stating that a prison warden "is entitled to relegate to the prison's medical staff the provision of good medical care"). Once alerted, however, "[n]on-medical defendants cannot simply ignore an inmate's plight." *Arnett*, 658 F.3d at 755. A non-medical officer is alerted of a constitutional violation if the inmate sends a communication which, "in its content and manner of transmission, [gives] the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (quoting *Farmer*, 511

8

U.S. at 837). Upon receiving such a communication, the official's "refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Id.*

There are three main pieces of evidence that suggest Hardy's actual knowledge of Degrado's broken wrist and the delays in his treatment. First, Degrado claims to have spoken to Hardy about his injury in November 2011. (Pl.'s Mem. of Law, Ex. 3, Degrado Dep. 23:12–24:19, Dkt. No. 220-3) Degrado recalls showing Hardy his wrist and saying, "I need help . . . [n]obody will help me." (*Id.* 24:12–13.) He says that Hardy responded by saying that he would look into it. (*Id.* 24:16.) Hardy, for his part, states that he has no memory of this conversation. (DRPSOF ¶ 14.)

Second, Hardy signed off on a response to a letter from Degrado's mother, D'Arry Frank. Frank's letter, dated November 14, 2011, stated that Degrado had suffered from long delays in treatment, that medical staff refused to give Degrado medical consent forms that would have given Frank access to his records, and that Degrado's broken wrist needed expedited treatment. (Pl.'s Mem. of Law, Ex. 8, Nov. 14 Frank Letter, Dkt. No. 220-8.) Hardy signed off on a return letter dated December 8, 2011, which (1) stated that Degrado was "receiving the appropriate medical attention" and (2) directed "Medical Records" to send Degrado release forms to authorize sharing of information with Frank. (Pl.'s Mem. of Law, Ex. 8, Hardy Resp. Letter, Dkt. No. 220-8; DRPSOF ¶ 23.) Hardy does not remember this communication, either. (DRPSOF ¶ 21.)

Third, Degrado submitted several grievances and also sent letters directly to Hardy complaining of inadequate medical care, although Hardy does not recall seeing or addressing them. (PRDSOF ¶¶ 18, 23.) Instead, Hardy's designee, Senor, responded to Degrado's grievances, signing Hardy's name. (*Id.* ¶¶ 20, 22.) The record does not indicate that Degrado received any response to his letters.

9

Considered together, the evidence creates a triable issue as to whether Hardy knew about Degrado's injury and his complaints that he was receiving inadequate medical care. A warden's signed response to a grievance, even when the warden claims not to remember or to have been involved in the grievance, may establish an issue of fact regarding the warden's knowledge. *Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (holding that a warden's signed response to a grievance creates a triable issue of fact regarding his knowledge of the grieved issue); *see also Brown v. Ghosh*, No. 13 C 2775, 2017 WL 1178151, at *18 (N.D. Ill. Mar. 29, 2017) (holding that even when a warden claims not to have reviewed a grievance, a triable issue of fact exists where his name is signed to a grievance response). But Degrado's evidence goes even further, including his unrefuted testimony that he told Hardy about his wrist injury and Hardy's response to Frank's letter. This evidence further supports the existence of a triable issue of fact. *See Brown*, 2017 WL 1178151, at *18 (finding that plaintiff's grievances and testimony regarding personal conversation with warden established triable issue regarding warden's knowledge); *Dixon v. Wexford Health Sources, Inc.*, 12 C 5531, 2016 WL 5720442, *5 (N.D. Ill. Sept. 30, 2016) (same).

The next question is whether Hardy "disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[D]eliberate indifference may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or turn[s] a blind eye to it." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (internal quotation marks and citation omitted). Non-medical prison officials have been found to respond adequately to prisoner complaints where they "investigated [the prisoner's] complaints, sought reports from medical officials, and relied on the judgment of the prison physicians." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008); *see also Greeno v. Daley*, 414 F.3d 645, 655–56 (7th Cir. 2005) ("We do not

10

think [the grievance appeals officer's] failure to take further action once he had referred the matter to the medical providers can be viewed as deliberate indifference"). In other words, a nonmedical prison official may find safe harbor by investigating and referring medical complaints to medical staff. However, Defendants cite no authority providing that a prison official may take no action to investigate prisoner complaints. To the contrary, an official who "turn[s] a blind eye" may incur liability for deliberate indifference. *Perez*, 792 F.3d at 781; *see also Hayes*, 546 F.3d at 527 (noting that a prison official might not have been entitled to summary judgment if he "had ignored [the prisoner's] complaints entirely").

Hardy contends that Degrado has failed to offer evidence that he did nothing in response to Degrado's complaints. But the record reflects otherwise. To start, Hardy does not remember receiving Degrado's complaints or taking any action to address them. He has no record of having done so. Even though the parties have submitted various medical records, notes, responses to grievances, and other materials, Hardy has not identified anything demonstrating that he followed up on Degrado's complaints. The closest he comes is one line in his letter to Frank—stating that Degrado was "receiving the appropriate medical attention"—which still does not establish that Hardy followed up on Degrado's complaint. (Hardy Resp. Letter.) Hardy was not entitled simply to assume that Degrado was receiving appropriate treatment—that would constitute turning a blind eye to a serious medical condition. Also, evidence suggests that Degrado's care did not improve and that he suffered needless, months-long, damaging delays because nobody helped him to get records delivered to his surgeon. In all, a reasonable jury could infer that Hardy took no action to respond to Degrado's complaints. To hold otherwise would require the Court to draw inferences against Degrado, which it may not do at the summary judgment stage. *McCann v.*

11

*Iroquois Mem'l Hosp.*, 622 F.3d 745, 753 (7th Cir. 2010) (noting that courts must credit reasonable inferences at summary judgment).

Hardy insists that he cannot be held liable just because he ruled against Degrado on a grievance or because he reviewed Degrado's grievances. *See Burks*, 555 F.3d at 595–96 (holding that grievance officer who rejected grievance as untimely was not required to further investigate prisoner's complaint); *George v. Smith*, 507 F.3d 605, 609–10 (7th Cir. 2007) (holding that officials must participate in a constitutional violation to incur § 1983 liability; the mere denial of an administrative complaint is not enough). Hardy further points out that he is not liable for the conduct of his subordinates just because he participated in the grievance process. *Thomas v. Knight*, 196 F. App'x 424, 429 (7th Cir. 2006) (holding that a warden is not liable for misconduct just because his subordinate did not rule for a prisoner in the grievance process). These arguments miss the point, however. Degrado contends that the grievance process shows Hardy knew about Degrado's complaints alleging a serious deprivation of medical care but did nothing to address them. As discussed above, such knowledge would obligate Hardy to do ***something***, even if only to refer the matter to the HCU. Thus, Hardy's counterarguments do not address his responsibility to refer or investigate.

Hardy attempts another defense, asserting that if he or his designees had inquired regarding Degrado's care, they would have been assured that Degrado was being adequately treated based on his treatment notes. (*See* Degrado Treatment Notes, Dkt. No. 225.) But this argument also misses the mark because a jury could find that Hardy did nothing to investigate Degrado's complaints. As discussed, Hardy testified under oath that he does not remember Degrado's complaints and the record does not suggest that he investigated them. Without offering

12

evidence that such an investigation occurred, Hardy's hypotheticals regarding what might have happened are immaterial.

Hardy suggests in passing that Degrado cannot prove Hardy acted with deliberate indifference because it is unclear whether there was deliberate indifference by the medical practitioners who provided care to Hardy. He further asserts that it is unclear whether the deformity in Degrado's wrist was caused by the accident at Stateville or by a prior accident. However, Degrado's unrebutted expert report attributes his injury and loss of wrist function to the inadequate care he received while imprisoned at Stateville. (DRPSOF ¶ 36.) And Hardy has not developed the argument that a jury could not find such a link based on the admissible evidence produced by the parties. So this argument also fails.

Finally, to the extent Hardy asserts that Degrado failed to exhaust his administrative remedies, *see Woodford v. Ngo*, 548 U.S. 81, 88–90 (2006), Hardy has waived or forfeited that argument by reserving it for his reply brief. *See Gold v. Wolpert*, 876 F.2d 1327, 1331 n.6 (7th Cir. 1989) ("It is well-settled that new arguments cannot be made for the first time in reply."). Exhaustion under the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e *et seq.*, is an affirmative defense, not a jurisdictional requirement. *Pavey v. Conley*, 544 F.3d 739, 740–41 (7th Cir. 2008). Accordingly, it may be waived or forfeited by a defendant's failure to timely raise the issue. *See Burton v. Ghosh*, 961 F.3d 960, 969 (7th Cir. 2020) (holding that a failure to raise the affirmative defense of *res judicata*, after case had been open for six years and extensive discovery conducted, constituted waiver or forfeiture of issue).

### B. Brown-Reed

Turning next to Brown-Reed, Degrado has not offered evidence that she knew about Degrado's complaints, let alone failed to respond to them. In their opening brief, Defendants

assert that such evidence was lacking and Degrado has not responded to their argument. Thus, Degrado has waived the argument that Brown-Reed personally knew of, but failed to respond to, his complaints regarding his medical care. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). And indeed, the parties have not pointed to any evidence that could establish Brown-Reed's subjective knowledge of Degrado's serious medical condition. There is no indication that any of Degrado's grievances were actually reviewed by Brown-Reed. Therefore, a reasonable jury could not find Brown-Reed deliberately indifferent based on her personal involvement in Degrado's care.

## II.  Defendants' Administration of Stateville's Grievance System

Degrado also offers an alternate theory of liability based on Defendants' administration of and participation in the Stateville grievance process. But, as discussed above, to prove deliberate indifference, it is not enough to demonstrate that Defendants neglected to take appropriate action. *See Walker v. Rowe*, 791 F.2d 507, 508 (7th Cir. 1986) ("[M]ost provisions of the bill of rights do not forbid simple neglect, and the Constitution does not make supervisory officeholders vicariously liable for the acts and omissions of their subordinates.") (citations omitted). Rather, Degrado must show that Defendants, "acting with a culpable state of mind, knew of a significant risk to [his] health and disregarded that risk." *Hemphill v. Wexford Health Sources, Inc.*, No. 15 CV 4968, 2016 WL 2958449, at *2 (N.D. Ill. May 23, 2016).

Degrado asserts that Hardy and Brown-Reed directly oversaw an institutionally indifferent grievance process. Specifically, he notes that Hardy was the ultimate decision maker for emergency medical grievances, even though he lacked the competence to make medical judgments. (DRPSOF ¶ 1.) Degrado contends that Hardy was therefore deliberately indifferent to the serious medical needs of all Stateville inmates. Likewise, Brown-Reed supervised the staff of

14

the HCU and frequently consulted with staff regarding medical grievances, but she testified that she never consulted with Hardy or grievance officers to determine whether inmate grievances represented emergencies. (*Id.* ¶ 7.) For this reason, Degrado asserts that Brown-Reed was also deliberately indifferent to the serious medical needs of all Stateville inmates.

 Degrado contends, with some justification, that the grievance process accomplished nothing for him. There were delays in processing Degrado's grievances, including the grievances he marked as "emergencies," and the record does not indicate that his grievances mitigated his harms or provided him with any relief. But a reasonable jury could not find that the entire grievance system was constitutionally deficient based only on Degrado's experiences, and Degrado has not offered evidence that the grievance system was fundamentally defective. Although he complains that Hardy lacked medical expertise as the final decisionmaker on grievances, the record indicates that Hardy delegated authority over grievances to grievance officers and does not indicate that those officers generally failed to consult appropriately with medical experts when necessary.

 Degrado also provides no authority suggesting that "institutional indifference" is a viable method of proving deliberate indifference. He cites *Wilder v. Sutton*, No. 04-CV-874-DRH, 2010 WL 5343282 (S.D. Ill. Dec. 21, 2010), which denied a warden's summary judgment motion in a First Amendment case regarding possession of religious items. That court held that "the [w]arden may delegate his duty to review inmate grievances[,] [but] may not play a 'shell game,' delegating responsibility without disclosing to whom it is delegated, then denying personal responsibility when a prisoner seeks to hold him accountable." *Id.* at *7. But here, unlike in *Wilder*, Hardy has disclosed the person to whom he delegated review of Degrado's grievance. Also, *Wilder* did not address whether a grievance process can be so flawed that it makes a warden personally liable for

15

any harm of constitutional significance grieved by any prisoner—which is the theory of liability that Degrado advances. Degrado also points to the passage in *Perez* stating that "deliberate indifference may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or turn[s] a blind eye to it." 792 F.3d at 781 (7th Cir. 2015). But *Perez* dealt with the liability of officials who learn of or contribute to unconstitutional conduct; the case does not speak to Degrado's "institutional indifference" theory. *Id.* at 781–82. And no material evidence indicates that Hardy or Brown-Reed participated in reviewing and deciding Degrado's grievances.

In sum, the limited evidence Degrado has presented of defects in the grievance system would not allow for a reasonable jury to conclude that Hardy or Brown-Reed, on that basis alone, "knew of a significant risk to [his] health and disregarded that risk." *Hemphill*, 2016 WL 2958449, at *2. At most, the evidence might tend to show neglect, but it does not rise to the level of recklessness or intentionality. *See Norfleet*, 439 F.3d at 397. Deliberate indifference requires actual knowledge, and Degrado has not squared that requirement with his alternate theory of liability, at least as applied to an individual defendant. *Cf. Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (holding that "if institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible" as to third-party prison medical provider).

16

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Dkt. No. 212) is granted in part and denied in part. The motion is granted as to Degrado's claim against Brown-Reed but denied as to his claim against Hardy.

ENTERED:

Dated: August 24, 2021

_____
Andrea R. Wood
United States District Judge